Willie Bernard **HARRIS**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 8070.

United States Court of Appeals
Fourth Circuit.

Argued Sept. 26, 1960.

Decided Nov. 17, 1960.

Morris Lee Kaplan, Baltimore, Md.
(Nathan Stern, Baltimore, Md., Norman
S. Bowles, Jr., and Joseph C. Turco,
Washington, D. C., on brief), for appellant.

John Gordon Underwood, Asst. U. S.
Atty., Baltimore, Md. (Leon H. A. Pierson, U. S. Atty., Baltimore, Md., on brief),
for appellee.

Before SOBELOFF, Chief Judge, and
HAYNSWORTH and BOREMAN, Circuit Judges.

BOREMAN, Circuit Judge.

Willie Bernard Harris appeals his conviction on a charge of conspiring in the
District of Maryland to pass, utter, publish, sell and transfer counterfeit bills
in that District and elsewhere. Perceiving no reversible error, we are of
opinion that we must affirm.

In the first count of an eight count
indictment, Harris, Nathiel Smith, Lawrence Jack Crouse and Harry Pincus
were charged with conspiring with each
other and with Leonard Marvin Kanthal
(who was named but not indicted) and
other persons unknown, from on or about
June 30, 1959, and continuing until and
including July 7, 1959, in the State and
District of Maryland and elsewhere, to
pass, utter, publish and sell certain counterfeit $100 Federal Reserve notes and
to sell, exchange, transfer and deliver
certain counterfeited obligations of the

United States, including but not limited to Federal Reserve notes particularly described. Ten overt acts were charged in the indictment as having been committed in furtherance of the conspiracy.

In the fourth count, Harris was charged with transferring and delivering a specified counterfeit $100 Federal Reserve note to Nathiel Smith. Harris was charged in the fifth and sixth counts, respectively, with transfer and delivery of counterfeit notes to Jack Crouse and Harry Pincus. Smith, Crouse and Pincus were separately charged with similar offenses in certain of the other counts. Crouse had been earlier indicted in another case, charged with passing two specified counterfeit bills in Baltimore. The two cases were tried together.

Pincus was not in custody at the time of trial. Smith and Crouse elected a jury trial but Harris elected to be tried by the court without a jury. Smith took the witness stand and was acquitted on all counts. Crouse did not testify and was convicted by the jury of all charges against him.

The court granted Harris' motion for acquittal as to counts five and six at the close of the Government's case but denied such motion as to counts one and four. Harris did not testify and, at the close of the entire case, renewed his motion for acquittal as to the first and fourth counts. The court granted the motion as to the fourth count because of a reasonable doubt as to whether Harris passed the specified counterfeit money to Smith *in the District of Maryland*. The court found Harris guilty of conspiracy as charged in the first count and sentenced him to imprisonment.

Harris contends (1) that there was no substantial evidence of a conspiracy upon which the court could have based a finding of guilt and that the evidence, at best, disclosed only suspicious circumstances, the inferences to be drawn therefrom supporting nothing more than speculation, guess and conjecture; and (2) that the court erred in admitting the testimony of one John Nofplot as to acts done and statements made by Harris aft-er the date alleged in the indictment as the termination of the conspiracy.

The trial court, in a memorandum opinion, found the following facts:

"In June, 1959, Harris lived in Miami, Florida. Crouse had been working in Miami as a bartender at the Blue Bay Motel. On June 29 Crouse and Miss Virginia Smith in one car, Harris and Mrs. Kay Fine in another car, together with a man identified only as Harry, left Miami for Maryland and New Jersey. On the evening of July 1 the party checked in at the Diplomat Motel in Washington, D. C. Harris registered under a false name, Alfred G. Hamilton, using a Diners' Club card Hamilton had lost at the Blue Bay Motel a short while before. Later that evening they went to the Crossroads Restaurant in Bladensburg, Md., owned by Nathiel Smith. Smith had known Harris in Miami but did not know Crouse. Kanthal, a former boxer, who had formerly worked for Smith at the Crossroads Restaurant, was also at the restaurant late in the evening of July 1. Smith entertained the group from Miami and a few other friends at a private party after the restaurant closed at 2:00 A.M., and visited Harris at the Diplomat Motel the following day. The party came back to the Crossroads Restaurant for another party the following night.

"On July 3, July 4, and Sunday, July 5, Smith met Kanthal several times. On July 3, 4, and 5, Kanthal passed between 40 and 50 counterfeit bills in Washington, D. C., Chesapeake Beach, Md., Gambrills, Md., Baltimore, Md., and neighboring areas, including the two counterfeit bills specified in the overt acts, which were passed as charged.

"On July 3 Harris added Miss Louise Angel, a night club dancer, to his party; and Harris and Miss Angel, Crouse and Miss Smith, Harry and Mrs. Fine, went to Atlantic City where they visited at Mrs.

Fine's house in or near Pleasantville, N. J. While there one of the women saw a paper bag containing a large sum of money in Harris' bedroom, as well as a lot of miscellaneous inexpensive merchandise, some of which Harris gave to Miss Angel.

"On Monday, July 6, Harris and Miss Angel, Crouse and Miss Smith, left New Jersey for Baltimore. Harris had two paper bags containing 'money', the genuineness of which is not testified to by anyone. He put one paper bag in the glove compartment of the car and gave the other paper bag to Miss Angel to carry in her handbag. The same day Crouse and Harris met at the Lord Baltimore Hotel, in Baltimore.

"On July 6 and 7 Crouse passed three specified bills in Baltimore. Besides those passed by Kanthal and the three proven to have been passed by Crouse, the Secret Service has in its possession about a dozen other similar bills passed in the Washington-Baltimore area.

"After July 7 Harris and Crouse returned to Florida. During the last week in July, in Miami, Harris gave John Earl Nofplot, to be passed by Nofplot in the Middle West, 50 counterfeit bills with similar serial numbers to those passed in Maryland. Harris told Nofplot that he had worked with others on a 50–50 basis; that he had recently been on a trip; that the trip had been successful and the 'money' had been accepted by the public."

Under its Conclusions of Law, the court stated:

" * * * I am satisfied beyond a reasonable doubt that in the District of Maryland, during the period between June 30 and July 7, 1959, Harris conspired (1) with Crouse and (2) with Kanthal or with someone who delivered the counterfeit bills to Kanthal after receiving them from Harris, to pass in Maryland the counterfeit bills described in the first count of the indictment in this case * * * and to transfer and deliver such bills. I further find that after Harris formed or joined the conspiracy, several of the overt acts were performed as charged, in furtherance of the conspiracy, including the passing of the two specified bills by Kanthal at Gambrills, Md., and Baltimore, Md., respectively, and the passing of the two specified bills by Crouse at Baltimore, Md."

There was testimony from which the court could have found additional facts, namely, that as a part of the plan to pass the counterfeit bills, purchases of small inexpensive items of merchandise would be made, the counterfeit bills presented in payment therefor and the remainder received in cash; that Kanthal was to receive $20, represented by purchased merchandise and cash, from each $100 counterfeit bill; that on the trip to Atlantic City with Crouse and others, Harris continued to use the assumed name of Alfred G. Hamilton.

In that portion of the memorandum opinion preceding the formal Findings of Fact, the trial court stated that all of the counterfeit notes referred to in the indictment and in the evidence are falsely made and counterfeited $100 Federal Reserve notes on the Federal Reserve Bank of Chicago, all of them bearing the serial numbers beginning with the letter "G" (designating Chicago), having the same first six numbers, 424378, and ending with two numbers between 01A and 49A, e. g., G42437807A, with face plate numbers K21 and L21 and back plate number 110. These recitals are fully supported by the evidence.

■■ It is not the proper function of an appellate court to weigh evidence anew or to determine the credibility of witnesses at the trial. The verdict must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it.[1]

1. Glasser v. United States, 1942, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; United States v. Giuliano, 3 Cir., 1959, 263 F. 2d 582, 584.

Presently omitting from consideration the testimony of witness Nofplot hereinafter discussed, the case against Harris was wholly circumstantial since no witness affirmatively and directly testified that Harris was a party to the alleged conspiracy.

■ However, the law is well settled that a conspiracy charge may be sustained on circumstantial evidence standing alone.[2] As stated in Glasser v. United States, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680,

> "Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and a collocation of circumstances.'"

The court in Madsen v. United States, 10 Cir., 1948, 165 F.2d 507, at page 511 said:

> "It is rarely that a conspiracy is susceptible of direct proof. Men do not ordinarily reduce such unlawful agreements to writing or make them a matter of record. Ordinarily criminal conspiracies must of necessity be established largely by indirect and circumstantial evidence, and by inferences largely deductible from the acts and conduct of the conspirators."[3]

In summary review, *there was direct evidence of a conspiracy between Smith and Kanthal to pass the counterfeit bills which were identified and described with particularity.* Evidence of circumstances before the court discloses that Harris and Crouse, known to each other in Miami, left Florida, obviously by prearrangement and with an agreed destination. Harris registered his party at a motel not far from Smith's restaurant, using an assumed name. Harris knew Smith and, soon after arrival at the motel, Harris,

Crouse and party went to Smith's place of business where they remained until very late at night and after Smith's regular closing hour. There was evidence that Smith went to his private office and that Harris and then Crouse went into the same office. There was testimony to the effect that Kanthal, with an unsavory reputation and known to Smith as his former employee, was at the restaurant but not with the Harris party; that Smith went to visit Harris at his motel the next day; that Harris, Crouse and party returned to Smith's place of business that evening; that within a day or two thereafter, Kanthal was engaging in passing the counterfeit $100 bills in the Maryland-District of Columbia area; that Harris and Crouse, with others, journeyed to Atlantic City, Harris still using an assumed name in a public business establishment; that Harris was seen to have in his possession two bags of "money" and inexpensive items of merchandise; that the "money" was handled and transported back to Baltimore in a strange and unusual manner; that Harris and Crouse, who traveled in separate cars, got together soon after their return to Baltimore; that Crouse was passing in that area counterfeit $100 bills of the same kind and description as those passed by Kanthal, offering them as payment for merchandise.

As stated in Phelps v. United States, 8 Cir., 1947, 160 F.2d 858, 867, 868,

> "It is perhaps trite here to repeat that under the federal statute conspiracy is a joining of intentions to engage in or further some unlawful action together, plus the taking of any step by one or more of the parties toward effecting the mutual object. * * * Such a joining of intentions into a conspiracy may, and ordinarily only can, be established by inference from evidence of rela-

---

2. United States v. Giuliano, 3 Cir., 1959, 263 F.2d 582; United States v. Migliorino, 3 Cir., 1956, 238 F.2d 7; United States v. Georga, 3 Cir., 1954, 210 F.2d 45.

3. As to proof of conspiracy by circumstantial evidence, see also: Pastrano v. United States, 4 Cir., 1942, 127 F.2d 43; Pittsburgh Plate Glass Co. v. United States, 4 Cir., 1958, 260 F.2d 397; Williams v. United States, 4 Cir., 1959, 271 F.2d 703.

tionships and conduct and other probative circumstances. * * * Once there is satisfactory proof that a conspiracy has been formed, the question of a particular defendant's connection with it may be merely a matter of whether the stick fits so naturally into position in the fagot as to convince that it is part of it. It is therefore possible for the circumstances on an individual defendant's participation in an established conspiracy to become substantial from their weight in position and context, though in abstraction they may seem only slight. * * * And, of course, a defendant can join a conspiracy at any time and may be found to have done so when, with knowledge of its existence, he has undertaken to further its design.

* * * * * *

"It is not for us, on an appeal from a conviction, to weigh the conflicting facts, circumstances and inferences of the trial proceedings, but only to consider whether the evidence in its most favorable aspect to the Government is legally capable of allowing a jury to become persuaded of guilt."

We shall now consider the testimony of witness Nofplot. The conspiracy was charged in count one of the indictment to have ended on July 7. Immediately after that date Harris and Crouse returned to Miami. Nofplot who, at the time he appeared as a witness, was serving a sentence in Indiana for passing a counterfeit $100 bill, testified in substance to the following facts. He arrived in Miami about four o'clock on the morning of July 24 and immediately communicated with Harris by telephone as Harris was expecting him. They were acquainted and Nofplot then owed Harris about $2,000. By arrangement they met at the Harris home about noon the next day. He went to Harris' bedroom, and a person, introduced as Harry, was present. A large quantity of money was on the bed. Harris showed Nofplot some of these bills and another which was stated to be genuine. Harris gave him fifty $100 bills and they discussed terms since Nofplot planned to pass counterfeit notes with a partner who lived in Chicago. Harris explained that he had worked with others on a 50–50 basis, "where they took the bills out, passed them, kept $50 and returned to him the change from the purchase, which he liked to limit to a $20 purchase." As Nofplot did not want to be bothered with shipping the merchandise to Harris, it was agreed that he would pay Harris forty per cent. Harris asked him if he would like to go out with "Harry" that night to observe how the bills were passed, but Nofplot declined since he did not know Harry and wanted to get back to Chicago. Harris told him that he had been on a trip, that the trip was successful and the "money" had been accepted by the public.

When on the witness stand Nofplot was shown a group of seven purported Federal Reserve Bank of Chicago $100 bills, all having the common serial number G424378, the last numbers and letter being, respectively, 06A, 02A, 36A, 47A, 42A, 46A and 38A. These bills were counterfeit and had been passed at the Western Union office in Gary, Indiana. While Nofplot did not undertake to positively identify these as bills which he had received from Harris, he testified with respect thereto as follows: "These are drawn on the Chicago Federal Reserve Bank, which were the ones Mr. Harris showed me. They are the same series of serial numbers as the ones Mr. Harris gave me. Except for that, that is the only comparison I can give." In response to a question as to whether Nofplot went to Gary in an attempt to pass counterfeit bills, he stated: "I drove from 50th and Lake in Chicago to Gary, Indiana, in the presence of a girl and two men. The two men were partners. When we arrived in Gary, Indiana, the young lady and I sat in the car around the corner from the Western Union office while my two partners went into the office and came back. Nothing was said about passing any money in the presence of the girl." Under questioning, Nofplot had to

admit that he could not, and did not, actually see his partners enter or leave Western Union. Thus the court could not admit these particular bills as having been passed by Nofplot or his partners.

The court, however, admitted in evidence the seven counterfeit bills for "the very narrow purpose of showing that the bills which Harris gave to the witness, or which the witness said Harris gave to him, were the bills drawn on the Chicago Bank having the same serial numbers as these bills and * * * for that narrow purpose and for no other purpose." In a further discussion, the court made it plain that the bills were admissible as to Harris alone and not as to the other defendants. But the court, in its Findings of Fact, noted that Harris gave to Nofplot, to be passed, fifty counterfeit bills "with similar serial numbers to those passed in Maryland." This finding was obviously based upon Nofplot's testimony as to the similarity of the serial numbers of the bills received from Harris.

■ It is contended that it was error to admit this testimony of Nofplot, but it must be noted that these transactions and conversations between Harris and the witness were had within a relatively short time after the return of Harris and Crouse from Maryland and the District of Columbia to Florida.

■ Relevant declarations or admissions of a conspirator made in the absence of the co-conspirator, and not in furtherance of the conspiracy, may be admissible in a trial for conspiracy as against the declarant to prove the *declarant's* participation therein. Delli Paoli v. United States, 1957, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278; Lutwak v. United States, 1953, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593.

In Connelly v. United States, 8 Cir., 1957, 249 F.2d 576, 588, the court said:

"* * * Acts done by a conspirator even after the termination of the conspiracy are properly admissible as having probative value as bearing on the intent and purpose of the conspirator in doing acts during the existence of the conspiracy. * * *

"It is now well established that evidence of acts or transactions not done in furtherance of the conspiracy may nevertheless be admitted if they tend to connect the conspirator with the conspiracy 'by explaining his state of mind.'"

In Phelps v. United States, 8 Cir., 1947, 160 F.2d 858, 873, it was held:

"* * * A party's statements are always competent evidence against him unless they fall within some special exclusionary rule. Where they have been received in evidence, the fact that they may have only remote relevance to the issue being tried is not ground for reversal, unless they are such as are clearly apt to have confused the jury's mind or to have improperly swayed its judgment. Peoples Loan & Investment Co. v. Travelers Ins. Co., 8 Cir., 151 F.2d 437, 440. As the Supreme Court has said, 'much discretion is left to the trial court [in a conspiracy case], and its ruling [on the admission of evidence] will be sustained if the testimony which is admitted tends even remotely to establish the ultimate fact.' Clune v. United States, 159 U.S. 590, 592, 593, 16 S.Ct. 125, 126, 40 L.Ed. 269.""

In United States v. Alfano, 3 Cir., 1945, 152 F.2d 395, 397, it is stated:

"'Statements, admissions, or narratives by one conspirator after the conspiracy is ended are not competent against other conspirators, but such evidence is admissible against the conspirator who makes them. Heard v. United States, 8 Cir., 255 F. 829 * * *.'"[4]

---

4. See also Cleaver v. United States, 10 Cir., 1956, 238 F.2d 766, 769; Quirk v. United States, 8 Cir., 1947, 161 F.2d 138, 142.

We do not lose sight of the fact that only Harris was on trial before the court and Nofplot's testimony related only to this particular defendant. The alleged conspiracy ended on July 7 and it was after that date when Harris returned to Florida. Nofplot visited Harris in less than three weeks thereafter and Harris told him he had been on a successful trip and the bills which he was displaying to Nofplot had been accepted by the public. It is stated in appellant's brief that "it is not clear from the Judge's 'Conclusions of Law' whether he took into consideration in arriving at the verdict of guilty the Nofplot testimony," but it would appear that the court reasonably and properly accepted and considered Nofplot's testimony to the effect that in late July Harris had in his possession $100 bills drawn on the Federal Reserve Bank of Chicago with the same series of serial numbers as the counterfeit bills which had been passed by Kanthal and Crouse during the period of the alleged conspiracy. It is true that the acts of Harris, as related by Nofplot, were not in furtherance of the conspiracy charged in the indictment, but evidence of those acts was not offered to support such theory. These circumstances and conversations were but links in the chain of circumstantial evidence tending to prove Harris' connection with and participation in the conspiracy between and among Smith, Kanthal, Crouse, Harris and other persons unknown as charged in the indictment.

From all of these circumstances, viewed in the light most favorable to the Government, the trial judge could have drawn inferences which could have convinced him beyond a reasonable doubt that a conspiracy existed, that Harris was a party thereto and that overt acts as charged in the indictment were committed in furtherance of the conspiracy.

Perceiving no error, the conviction will be

Affirmed.