**UNITED STATES of America,
Appellee,**

v.

**Harold Stanley CLOSE, Appellant.**

**No. 9379.**

United States Court of Appeals
Fourth Circuit.

Argued Nov. 19, 1964.

Decided Aug. 9, 1965.

Lewis T. Booker (Court-assigned counsel), Richmond, Va., for appellant.

Robert W. Kernan, First Asst. U. S. Atty. (Thomas J. Kenney, U. S. Atty., on brief), for appellee.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and BOREMAN, Circuit Judges.

BOREMAN, Circuit Judge:

Harold Stanley Close, appellant, and Carl Close, his brother, were jointly tried and convicted by jury on December 20, 1963, on a four-count indictment charging them with robbing the Edmondson Village Branch of the Equitable Trust Company, Baltimore, Maryland, on March 8, 1963, the bank's deposits being insured by the Federal Deposit Insurance Corporation. The undisputed evidence disclosed that two men were involved in the robbery and at trial Carl freely ad-

mitted his participation but undertook to exonerate Harold, claiming that an unnamed and unidentified prisoner whom he, Carl, had befriended when both were in the Federal Penitentiary at Leavenworth, was his accomplice. Harold Close has appealed but we think the judgment of conviction and sentence must be affirmed.

The sufficiency of the evidence to sustain the conviction is challenged and we find it necessary to review the evidence in some detail. The appellant will be referred to as "Harold" and his brother, as "Carl." Their married sister, Betty Lou O'Donnell, will be referred to as "Betty."

Harold was an electrician by trade. He had received personal injury settlements of $8,600 in 1953, $24,000 in 1958, and $2,760 in July of 1961. From September 1960 to October 1961, Harold engaged in a used automobile business in Pittsburgh, Pennsylvania, under the trade name of Close Auto Sales, but this venture proved to be financially disastrous and he returned to his trade. During 1962 he had left his wife and children and lived with his sister, Ann Silver, and her husband, Jack, in Pittsburgh. Harold took Jack Silver as an apprentice but they were unable to find steady work and in early December 1962 they traveled in Harold's automobile to South Carolina and in Florida, unsuccessfully seeking employment. They then went to Nokomis, Florida, where Harold's parents and some of his brothers and sisters resided. There they worked for a very short period.

Harold renewed his acquaintance with his brother, Carl, who had been convicted on a Federal charge of bank robbery in 1949, and who had been released on parole about eighteen months before they met in Nokomis. Carl had been employed as a sheet metal worker but was hospitalized and unable to work for several weeks after Christmas 1962. While in Nokomis, Harold traded his Cadillac automobile to his father for a 1950 Oldsmobile sedan which he registered in the name of Robert Reis, obtaining 1963 Florida license tags bearing the number 16W15697. Harold later offered the explanation that he used the name "Reis" because his wife was attempting to charge him with nonsupport and he feared she would trace him if he used his real name.

Jack Silver had left Florida and in early March 1963, Harold and Carl decided to go north. By arrangement their sister Betty was to accompany them and attempt to regain custody of three of her children who were with Betty's estranged husband in New Jersey. Their sister, Mrs. Silver, had sent Harold $500 in cash and had sent Carl a money order for $150.

Pursuant to plan, Harold, Carl, and Betty left Florida early in March but the exact time of their departure was not shown by the evidence. They traveled in the old 1950 Oldsmobile which had been wrecked and could not be driven fast. After several days they reached Winchester, Virginia, where they registered at a motel. The motel proprietress, whose testimony was stipulated, stated that, at about nine o'clock on the morning of March 7, 1963, a man registered under the name of Robert Wilson and gave a Pittsburgh address; that there were three in the party, two men and a woman, and "Wilson" made an advance payment for one day's rental of one room; that "Wilson" said they were on their way from Florida to Pittsburgh and had traveled all night. The proprietress selected a photograph of Harold as resembling the man who registered as "Wilson." In filling out the motel registration card, he gave his vehicle license number as Florida, 1615697, and the Pittsburgh address given was that of the Jack Silvers. This witness saw the woman and two men around later that same day but she could not say when they left since it was customary for departing guests to leave the key in the door; they made no further payment, however.

### THE BANK ROBBERY

The branch bank where the robbery was staged is located in the suburbs of

Baltimore in the Edmondson Village Shopping Center. At the rear of the shopping center there is a large parking lot. Another parking lot abuts a sixteen-foot sidewalk in front of the buildings where diagonal parking spaces are provided. On the west side and adjacent to the bank is a shoe store located at a corner of the shopping center.

Carl Grimm, forty-six years of age, who had owned or operated a Baltimore Sun paper route for seventeen years, parked his station wagon in front of the bank about 4:45 p. m. on March 8, 1963. He remained in the front seat while he awaited the return of his wife and daughter who were at a nearby doctor's office. From that position he had a clear and unobstructed view of the large front window of the bank. Shortly after five o'clock he observed two men wearing hooded sweat shirts or parkas, one red and one green, walking in his direction along the sidewalk in front of the shoe store some twenty or thirty feet away. They appeared to be in conversation and the man in red was nearer the curb. They entered the front door of the bank and Grimm's attention was particularly attracted to them because the day was warm and they were wearing the parkas with the hoods up over their heads although their faces were not covered.

Grimm watched them enter the bank and proceed therein a distance which he estimated to be somewhere between seven and fifteen feet, or to the limit of his vision, into the interior of the bank. The man wearing the red parka turned and came back close to the front window and peered out; his face was not covered and Grimm thought he "looked straight through" him; the man then turned facing the rear of the bank; as he turned, Grimm saw him move his hand toward his face and then observed that he apparently prevented someone from leaving the bank by the front door.

His suspicions aroused, Grimm backed his car out and drove across the street where he attempted to telephone the police. While there he saw the two men come out of the bank, run in front of

the shoe store, around the corner, and along the side of the building, dropping money as they ran. Two other witnesses saw the men running, saw the money, concluded that a robbery had taken place, undertook to follow them, and obtained the Florida license number on the rear tag of the getaway 1950 Oldsmobile which they reported to the police. A report of the robbery and a description of the Oldsmobile and the Florida license number were broadcast by police by radio about 5:30 p. m. This broadcast was heard by witness Hagstrom who was driving with his wife toward Alexandria, Virginia, and Washington, D. C. As they later stopped at a traffic light in Washington, an Oldsmobile occupied by two persons was driven alongside and one asked the location of Cathedral Street. Mr. Hagstrom could not furnish the information and the car pulled away, but at that time Mrs. Hagstrom wrote on a map the following:

"Cathedral 16W–15697 green Olds"

Mr. Hagstrom, realizing that this was the getaway car, followed it for a distance but lost it. The evidence disclosed that the occupants of the Oldsmobile made other inquiries concerning Cathedral Street which was shown to be one route to the Memorial Bridge leading directly into Virginia. Shortly after seven o'clock in the evening, Mr. Hagstrom reported to Washington police what he and his wife had observed.

At the time of the robbery there were several bank employees on duty and several customers were in the bank. The story told by witnesses was that, after the robbers entered the bank, they separated, each being armed with a pistol, the man in the red parka returned to the front of the bank, looked out through the window, took up a position near the front door, faced toward the rear of the bank, and placed a scarf over the lower half of his face; that the man in the green parka proceeded to the rear of the bank, placed a scarf over part of his face, vaulted over the counter, announced a "stick-up," scooped up money of all denominations in a brown shopping bag,

vaulted back over the counter, joined his companion, and they rushed out; that the robbery took only a few minutes. Three bank employees positively identified Carl from photographs and in open court as the robber who was wearing the green parka. None of those inside the bank was able to identify Harold as the one wearing the red parka since his face was partially covered from the very instant he faced the interior of the bank. The amount of money taken was over $20,000 but about $4,000 was dropped by the robbers and was recovered in and near the parking lot. Mr. Grimm positively identified Harold as the man in the red parka but this identification is the subject of later comment.

## OTHER PERTINENT DEVELOPMENTS

The 1950 green Oldsmobile was not seen again until approximately 10:00 p. m. on Saturday, March 9, when a resident of Winchester, Virginia, noticed a car being driven into a circular space across the street from her residence. The driver left in another automobile which had driven up. When the automobile was found, the Florida license tags had been removed and instead it bore a temporary Pennsylvania license tag which was ultimately traced to Close Auto Sales, the name under which Harold had operated in Pittsburgh. The car remained there for about three months until it was taken over by the F. B. I.

Mr. William Copenhaver, a seventy-three-year-old retired railroad employee, resided with his wife at 807 Woodland Avenue in Winchester and, at the rear of his lot, there was a two-stall garage with a furnished apartment over it which had its own mailing address and a separate entrance on an alley. According to Mr. Copenhaver, on the 6th day of March, he placed an advertisement in a local newspaper, for publication on March 7, 8, and 9.[1] Mr. Copenhaver thought that a lady called by telephone on the evening of March 8 to inquire about renting the apartment but he told her that she could call back after eight o'clock in the evening as another party had indicated interest; the lady called back after eight o'clock and a man and a woman whom he later identified as Harold and Betty, arrived, looked at the apartment, and rented it for one month; that the lady paid $75 in advance; that the parties gave their names as Robert and Sandy West and he assumed that they were husband and wife; that he thought they moved in the same evening between nine and nine forty-five o'clock. A receipt given by Mr. Copenhaver to "Robert West" for the rent in the amount of $75 and bearing date March 8, 1963, was found weeks later in an apartment in Roanoke, Virginia, which had been rented by Harold.

On Saturday, March 9, the day following the robbery, Carl and Betty purchased an Oldsmobile convertible from a Winchester used-car agency and paid several hundred dollars for it in cash.

Betty signed as the purchaser of the convertible and used the name Sandy West because Carl had told her that the 1950 Oldsmobile had broken down and that he had violated his parole.

On March 10 a man and woman, representing themselves to be Mr. and Mrs. Robert Cramer, rented a furnished apartment at 115 Mountain Avenue in Roanoke, Virginia. It was stipulated that Harold was the man who had represented himself to the landlady as Mr. Cramer and she stated that a photograph of Betty resembled the woman who said she was Mrs. Cramer. Harold paid rent of $95 on March 10 and the same amount on April 15, both payments being in cash. On March 12, a man and woman giving their address as 115 Mountain Avenue, Roanoke, purchased from a Mr. Gray,

1. The advertisement reads:
   "For rent, furnished apartment, three rooms and bath, private, residence section. Heat and water furnished. Adults only. Phone Mohawk 2–1106."

The newspaper records indicated positively that the advertisement was placed on March 5 and was published in the daily editions of the paper on March 6, 7, and 8.

at a used-car sales establishment, a black 1959 Ford for which they paid cash in the amount of $895. The woman gave her name as Jane Marie Cramer but, from a photograph, Mr. Gray later identified her as Betty and although he could not be positive, Mr. Gray thought that Harold was the man who was with Betty on that occasion.

On March 13, a man who was later identified as Harold, rented a furnished apartment at 1808 Williamson Road, Roanoke, Virginia, giving his name as Robert West. He made a deposit of $37.50 and paid advance rent of $75 for one month, both payments being made in cash. About ten days later, "West" paid another month's rent in cash stating he was going on a trip and wanted the apartment available upon his return. On April 20 a man representing himself as Robert West of 1808 Williamson Road, Roanoke, purchased from a used-car dealer in Salem, Virginia, about eight miles from Roanoke, a 1958 Chrysler Imperial for $950, the payment being made in cash from what was described as a large roll of bills. "West" had arrived there in a black 1959 Ford and in the car with him were a man and a woman, the latter carrying a small child.

The evidence disclosed that later in April and in May 1963, a man who drove a Chrysler Imperial was daily associating with one Mrs. Mildred Namie, a waitress in Destin, Florida. At the trial she identified Harold as the man she knew as "Robert West." According to this witness, Harold spent money freely, bought drinks, threw $100 bills around, played the juke box 50¢ at a time, chartered a fishing boat, provided her with money to spend at the dog races, to pay her rent, to buy a television set and gifts for her children; he offered to pay for her divorce. She last saw him in the latter part of May when he borrowed a small sum of money from her. He left Florida the next day.

On the early morning of May 22, 1963, in an isolated unoccupied dwelling in Destin, a fire had occurred under suspicious circumstances. A woman who was severely burned was found nearby and died a short time later. The investigating authorities learned that she had been in company with "Bob West" and other persons on the evening of May 21 and they wanted to question "West" as to his knowledge of the fire. They discovered that he had given his address as Roanoke, Virginia. Tracing him in some way from his Chrysler registration and Virginia license address, the authorities at Destin telephoned the Roanoke police on May 24 informing them of the fire, suspected arson, and the finding of the burned woman. The Roanoke police were told that "West" had been spending substantial sums in the Destin area; that he had told his associates he had recently inherited money; that he had rented a beach cottage proposing to occupy it for the season but after two weeks had left without checking out and disappeared. The Roanoke police were asked to locate him and interview him with regard to any knowledge he might have as to the fire.

As the story unfolds, it seems to lengthen. At this point, suffice it to say, that the Roanoke police located Harold on May 24 at his apartment at 1808 Williamson Road; that he was questioned and gave his name as Robert West; that he had a temporary registration for the Chrysler in the name of Robert Wirt and refused to be fingerprinted (see Appendix to Opinion for statements made to police). He declined to answer further questions. As testified by one witness, it appeared that "all of West's identification would indicate that he was born into the world some three months prior to that in Roanoke * * *."

The police conferred with the Commonwealth's Attorney and it was concluded that a warrant should be issued charging "West" with being a vagrant under section 63–338 of the Virginia Code which describes vagrants and those who may be punished as such. A warrant was issued on the morning of Saturday, May 25. "West" was arrested and taken to the Roanoke Detective Bureau where he was interviewed for about

forty-five minutes, and thereafter fifteen or twenty minutes were consumed in obtaining fingerprints and photographs. He was lodged in jail and his fingerprints were forwarded to the F.B.I. There was no magistrate available in Roanoke over the week end so Harold was held in jail. On Monday, May 27, he was taken before the Roanoke Municipal Court on the vagrancy charge where the Commonwealth's Attorney appeared and asked that Harold be held for trial without bail. The request was granted and his trial was set for June 6.

Following the Monday hearing, Harold obtained counsel to represent him and an appeal on the question of admission to bail was taken to the Hustings Court of the City of Roanoke. A hearing was held in that court on Wednesday, May 29. In the meantime Roanoke police had received a fingerprint report from the F.B.I. which disclosed that "Robert West" was actually Harold Stanley Close and that he had been arrested before. The police opposed his release on bond and the judge determined that Harold could be held without bond until June 5. The Roanoke police had been in frequent communication with the Florida officials who were investigating the fire and who had first requested that the Roanoke police interview "Robert West." After the May 29 hearing, the Florida authorities were notified that, if they wanted Harold, a warrant should be issued before June 5, but Florida authorities did not at any time request Harold's arrest and no warrant was ever issued for him in connection with the fire. On the morning of May 29, a Special F.B.I. Agent, Settle, made a routine visit to the Roanoke Police Department and was advised by Captain Cochran that they had arrested an individual using the name "Robert West" but who had been identified by the F.B.I. as Harold Stanley Close. Settle obtained background information and sent a teletype to the F.B.I. at Jacksonville, Florida, to inquire whether Harold was wanted by that office. About three o'clock that afternoon,

Settle received a telephone call from the F.B.I. office in Richmond, Virginia, advising him that a teletype had been received from the Baltimore F.B.I. office indicating that Harold was a suspect in a bank robbery in Baltimore and that Carl was wanted as a parole violator. Settle was requested to interview Harold, ascertain the whereabouts of Carl, and get such information as he could concerning the bank robbery; he then went to the Roanoke Police Department and asked as a matter of courtesy if he could interview Harold. Settle was told that a hearing was in progress to determine whether Harold should be released on bond. Settle then talked to Captain Cochran and advised him that as soon as the hearing was over he wanted to talk to Harold concerning the whereabouts of his brother Carl, a parole violator. After the hearing was concluded, he contacted Harold's attorney, Mr. Crush, and inquired whether it would be satisfactory if he interviewed Harold and Mr. Crush told him that he had no objection. Harold was then interviewed by Settle about four-thirty in the afternoon.

On the morning of June 1, 1963, a warrant of arrest charging Harold with participating in or committing a bank robbery was served on him in the Roanoke City Jail. He was immediately taken before a United States Commissioner and a preliminary hearing was postponed until Harold could have his counsel present. Another Special F.B.I. Agent, Yengst, had interviewed Harold on May 31, but prior thereto obtained permission from Attorney Crush for such interview. Harold was advised by Yengst that he need not make any statements, that if he so desired he could consult with his attorney, but if he made statements, they could be used against him in court. Harold did not desire to have his attorney present and agreed to the interview (see Appendix to Opinion).

Harold was interviewed in Baltimore, Maryland, on June 20, June 24, and June 25, 1963, by Agent Kennedy of the Baltimore F.B.I. It appears that, at each in-

terview, Agent Kennedy advised Harold that any statement he made would be considered a voluntary statement and could be used against him in court; that he was entitled to consult with an attorney; and that no threats or promises would be made to him to cause him to make a statement. Harold told Kennedy that he had an attorney and he did not desire to discuss the bank robbery; however, Harold continued the conversation, Agent Kennedy continued to listen, and continued to ask questions which Harold continued to answer (see Appendix to Opinion).

Carl was apprehended in September 1963. It was learned that in the meantime he had committed two additional bank robberies, one in Roanoke, Virginia, and one in South Carolina. He was returned to Baltimore for trial (see Appendix to Opinion for substance of Carl's testimony).

## DISCUSSION

Harold argues that not one of the numerous persons in the bank at the time of the robbery was able to identify him as the man in the red parka; that it was not he who came to the bank window but that whoever it may have been was in Grimm's view for a matter of seconds; that Grimm was looking through the windshield of his car and through window glass which had been treated with a preparation to reduce sun glare; that when first questioned by the police shortly after the robbery, Grimm described the robber at the window as being 5′ 10″ tall and weighing about 180 pounds, but that Grimm testified at the trial that the man in the red parka was 5′ 11″ or 6′ tall and weighed about 220 pounds;[2] that one young man who was

in the bank thought the robber by the front door had pock-marks and blemishes on his face, while the photograph of Harold showed his skin to be clear. In short, it is argued that Grimm's testimony is the only evidence to tie Harold to the crime; that this is too slender a reed upon which to base a case and insufficient to carry the prosecution's burden of proof of guilt beyond a reasonable doubt; that there is sufficient evidence to establish an alibi, that is, to show that Harold was engaged in renting an apartment in Winchester, Virginia, shortly after eight o'clock on the evening of the day of the robbery and that he could not possibly have reached Winchester by that time if he had been in the Oldsmobile when it was shown to have been in Washington, D. C., shortly before seven o'clock.

■■ Admittedly, if Grimm's testimony were inherently improbable or incredible as a matter of law this court should not permit the verdict to stand. It is obvious, however, that the jury chose to accept Grimm's testimony. The jurors were not persuaded by defendant's argument that Grimm's opportunity to observe Harold was from too great a distance, or that conditions of visibility were too poor, or that the period of the observation was too brief for Grimm to make a positive identification. Clearly, Grimm was a credible witness and the jury so indicated by its verdict. Mr. Bey, the bank manager, had only a brief view of Carl's face before it was partially covered and yet his identification of Carl was positive. The circumstances under which Grimm saw Harold and under which Bey saw Carl are not wholly dissimilar. Each saw a robber through glass since Mr. Bey had

---

2. Grimm admitted that his testimony at the trial was in conflict with his earlier statement but explained that if the officers had interrogated him at greater length soon after the robbery, he would have provided them with a more accurate description. When Grimm first looked at a photograph some three months later, he was not able to positively identify Harold but he did, on that occasion, select

Harold's photograph as resembling the robber at the window. Later, however, his identification of Harold from a more recent photograph was positive. Grimm had no difficulty in identifying Harold when he viewed a line-up where both Harold and Carl were among those in view. Nor did he have any difficulty in picking out Harold in the courtroom where both Harold and Carl were present.

Carl in view through the glass window of his inside manager's office; each saw a robber walk toward him and each viewed an uncovered face for a matter of seconds. Bey pushed an alarm button, Grimm hurried to notify police; each knew that all was not well and the circumstances were extraordinary and impressive. Bey's observations and identification were shown by Carl's judicial confession to be reliable. We cannot say that Grimm's identification of Harold was inherently incredible or less trustworthy than Bey's identification of Carl. The jury weighed the evidence and made a factual determination as it was the jury's province to do.

Harold complains that his arrest by the Roanoke police as a vagrant was illegal in that the arrest warrant was issued without probable cause and that any incriminating statements made by him while under illegal arrest were inadmissible in evidence against him.

■ Section 63–338(6) Code of Virginia (1950) describes as vagrants:

"All persons who shall come from any place without this State to any place within it and shall be found loitering and residing therein, and shall follow no labor, trade, occupation or business, and have no visible means of subsistence, and can give no reasonable account of themselves or their business in such place."

We find no cases in Virginia construing this statutory provision. In Morgan v. Commonwealth, 168 Va. 731, 191 S.E. 791, 111 A.L.R. 62 (1937), it was held that vagrancy statutes may be constitutionally enacted under police power. The contention is here made that this statute applies to one who is "loitering" and "residing"; that Harold was found to be "residing" but was not shown to be "loitering"; that the word "and" should be given its ordinary, literal, conjunctive meaning. Obviously we are asked to construe the word "loitering" as, perhaps, connoting something sinister or, at least, to mean one who is openly hanging around idly on city streets, in other public places, or in "dives" of some sort.

But we are not persuaded that it was the intention of the General Assembly to use the word "loitering" in any such restricted sense. One accepted meaning of the word is "wasting-away time." The police interrogated Harold concerning his knowledge of the fire in Florida as they had a legal right to do. During the course of their conversation, they learned that Harold came from without the State of Virginia, he was wasting away his time, and residing there in an apartment, he was following no business, he had no visible means of subsistence, and was unable to give a reasonable account of himself or what he was doing there. His unsatisfactory explanations were patently contradictory and, when he must have realized that he was getting in deeper and deeper, he refused to be fingerprinted and refused further interrogation.

Notwithstanding the apparent desire of the Roanoke police officers to assist the Florida authorities, the advice and assistance of the Commonwealth Attorney were sought and obtained before the warrant issued. We think that there were reasonable grounds for believing that Harold was a vagrant within the statutory definition, that there was probable cause for issuing the warrant, and that his arrest was valid.

Harold did not at any time confess guilt. On the contrary, he stoutly and steadfastly maintained that he was innocent of the charge of bank robbery. When first interviewed concerning his Florida activities, he willingly answered questions until he realized that his stories were in conflict. After his arrest on the vagrancy charge, both he and his attorney consented to further interviews and interrogation and Harold did not think it necessary that his attorney be present. The validity of his arrest for bank robbery is not challenged. After he was served with the warrant charging him with bank robbery and had obtained counsel, he was interviewed but he was first warned that any statement he made would be considered voluntary, could be used against him in court,

and that he was entitled to consult with an attorney. Harold replied that he had an attorney and did not desire to discuss the robbery but it appears that he voluntarily continued the conversation and continued to answer questions; to repeat, there is no claim or assertion that he was then being illegally detained. There is nothing in the record to indicate that he was threatened, intimidated, influenced by promises, or coerced in any way. He could have had counsel present if he had so desired, a fact which was made known to him but he was not confessing. Some of the stories told by him could have been true but they could not all be true because his accounts of his activities were changed from time to time and were full of apparent contradictions. It was his obvious purpose to lay the groundwork for the establishment of an alibi but Carl's and Betty's statements of events were at variance, one with the other, and in numerous instances in direct conflict with the versions given by Harold (see Appendix to Opinion). These three persons had been separated for several months; Carl and Harold were held in legal custody; Betty had no access to them, and they had no opportunity to discuss and agree upon details; consequently the discrepancies and conflicts were quite obvious and undoubtedly caused the jury to reject the claimed alibi as lacking credible evidentiary support.

■ It is contended that the police illegally arrested Harold on one charge and took advantage of his detention for the purpose of investigating a wholly different crime. First we reject appellant's premise that the initial arrest was illegal. Furthermore, it is clear that Harold's arrest and detention were not for the purpose of providing an opportunity for continued and relentless questioning concerning the bank robbery in order to obtain a confession. At that time Harold was not even a suspect and, when the F.B.I. obtained information that he and Carl were wanted in connection with the bank robbery, a warrant for Harold's arrest was soon issued and served and he was promptly taken

before a commissioner for a preliminary hearing. At Harold's request, the hearing was postponed until his attorney could be present but this delay cannot be charged to the federal officers. Actually, there is no complaint of the admission of incriminating statements made to anyone between Harold's arrest on the bank robbery charge and the preliminary hearing before the commissioner. Claim of support for the argument concerning arrest on one charge for the purpose of investigating another appears to be initially bottomed upon United States v. Carignan, 342 U.S. 36, 72 S.Ct. 97, 96 L.Ed. 48 (1951), where a prisoner's *confession* relating to one crime was obtained while he was being held upon another charge. But the Court there said:

"So long as no coercive methods by threats or inducements to confess are employed, constitutional requirements do not forbid police examination in private of those in lawful custody or the use as evidence of information voluntarily given." (p. 39, 72 S.Ct. p. 99).

■ It is urged that the instant case simply requires the application of a logical extension of the rule announced in Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100 (1948), and Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). In both those cases, confessions were held to be involuntary and inadmissible in evidence when it appeared there was unnecessary delay in taking a prisoner before a magistrate after arrest and each confession was obtained during that period. But, Harold was being held by the police of the city of Roanoke pursuant to a valid arrest warrant. Harold was not in custody of federal authorities nor was he being detained at their request. He had been arraigned before the Roanoke municipal court on May 27 on the vagrancy charge and was being held for trial on June 6. On May 29, Harold's appeal on the question of admission to bail was denied and later in the afternoon of that same day, he volun-

tarily talked to F.B.I. Agent Settle, but Settle did not testify at the trial concerning the details of that conversation; consequently Harold suffered no harm by reason of that interview. In the circumstances here and on these facts, we find no applicability of the principles announced in the Upshaw and Mallory cases.

Upon close analysis, it appears that the real complaint here is directed to the admission in evidence of statements made by Harold to F.B.I. Agent Yengst, during an interview on May 31, 1963, after the F.B.I. had been notified that Harold and Carl were wanted in connection with the bank robbery and before a federal warrant for Harold's arrest had been issued. Agent Yengst was acting under instructions in continuing the investigation of the robbery. Harold was warned as to his rights, including his right to counsel, but he voluntarily conversed with Yengst concerning the robbery, all the time maintaining his innocence and asserting that he could produce witnesses to establish an alibi. After the federal warrant was issued and Harold was placed under federal arrest, there was no delay in taking him before a commissioner and he was not interviewed during that period. Subsequent interrogations by the F.B.I. were after the arraignment and while Harold was legally held in federal custody.

It is true, as appellant contends, that the Supreme Court held in Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), that oral statements of an accused may be so inextricably and intimately bound up with the conditions and circumstances of an *illegal* arrest as to become tainted and inadmissible under the exclusionary rule of Weeks v. United States, 232 U. S. 383, 34 S.Ct. 341, 58 L.Ed. 652, supplemented by Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319. It is argued that the statements made by Harold while

under arrest on the vagrancy charge are tainted by the arrest and thus inadmissible in evidence against him. However, this argument is again incorrectly premised upon an arrest claimed to be *illegal.* Assuming, arguendo, that the initial arrest by the Roanoke police was illegal, we construe Wong Sun as holding, in effect, that not all oral statements are the fruit of the "poisonous tree" simply because they would not have been made but for the illegal actions of the police. We think the Court in Wong Sun, clearly indicates the view that a statement which is shown to have been freely and voluntarily made without coercion, either physical or psychological, may be thereby purged of any stigma of illegality and the statement is admissible. As we read the decisions of certain other courts, we conclude that they have so interpreted the Court's indicated view in Wong Sun. See: Rogers v. United States, 330 F.2d 535 (5 Cir. 1964); Burke v. United States, 328 F.2d 399 (1 Cir. 1964); Hollingsworth v. United States, 321 F.2d 342 (10 Cir. 1963).[3] There is abundant evidence to support the Government's contention that all statements made by Harold during any and all of his conversations with the police and the F.B.I. agents were voluntarily given, free of coercion, and with full knowledge of his rights. Thus we find no error in permitting evidence of these statements to be presented to the jury.

In addition to Grimm's identification of Harold as one of the robbers, there were other relevant circumstances which the jury could properly consider in determining the question of Harold's guilt or innocence. These may be summarized as follows: Harold's strained financial condition when he borrowed $500 from his sister several days before the robbery; the amount of cash obtained by the robbers; Harold's apparent affluence immediately following the robbery; his use of one alias after another and his changing the color of his hair in his efforts to conceal his identity; his denial that

---

3. But see Justice Brennan's footnote No. 12, Wong Sun v. United States, 371 U.S. at page 486, 89 S.Ct. 407.

he traveled from Florida to Winchester with Carl and Betty; his failure to produce witnesses, in accordance with his stated intention, to support his claimed alibi; the variations and conflicts in his own versions of events; the conflicts in the statements made by Harold and Betty and the story told by Carl as he testified at trial in attempting to exonerate Harold.

■ Where the evidence is in conflict, the jury's opportunity to observe the witnesses' demeanor is especially important and extremely helpful in judging their credibility United States v. Lowery, 306 F.2d 133 (4 Cir. 1961). There can be no sound reason for disturbing the verdict of guilt if there is substantial supporting evidence viewed in the light most favorable to the prosecution. United States v. Kolakowski, 314 F.2d 699 (4 Cir. 1963); Harris v. United States, 283 F.2d 923 (4 Cir. 1960).

■ Harold was charged in the indictment as Harold Stanley Close, alias Robert West, alias Robert Reis. He claims prejudice because the indictment, including the aliases, was read to the jury at the beginning of the trial. This contention is utterly frivolous. The relevant and clearly admissible evidence disclosed that Harold titled the getaway Oldsmobile in the name of Robert Reis and rented the apartments in Winchester and Roanoke as Robert West. The evidence of his activities and affluence after the robbery pointed to Harold, posing as Robert West. No prejudice resulted from reading the indictment to the jury.

Counsel for appellant claims that he is entitled to examine Court's Exhibits A, C, and D. One of these exhibits was a statement taken from Mr. Gray concerning an individual who was not involved in these proceedings. The others were notes of Assistant United States Attorney Kernan and F.B.I. Agent Yengst concerning their interviews with Betty. It is contended that these exhibits should have been made available to Harold's trial counsel under the provisions of the Jencks Act (18 U.S.C.A. § 3500). The court below inspected these documents in camera, determined that they were not properly discoverable and ruled that defense counsel was not entitled to examine them. The exhibits were identified, sealed, and made a part of the record by proper order so that they would be available to us "for the purpose of determining the correctness of the ruling of the trial judge" pursuant to the pertinent provisions of 18 U.S.C.A. § 3500(c). We have examined them and find nothing therein to indicate error in the trial court's ruling with respect thereto.

Affirmed.

### APPENDIX TO OPINION

Résumé of statements made by Harold, Carl, and Betty either to divers persons shortly after the bank robbery or at trial, or both. Our occasional comments will also appear.

#### HAROLD

Harold told Mrs. Namie in Florida that his father had died and left him an inheritance; that he didn't have to work, and that he never carried less than $1,000 in his wallet. He told Roanoke police his name was Robert West; that he was in Roanoke to do electrical work on a new hospital (the police knew that the excavation for the hospital project was in progress and that no electrical work would be available for a long time); that he was from Butler, Pennsylvania, and had no relatives or "anything they could check with"; that the money he had been spending had been earned by working as an electrician (he couldn't give the name of the company where he claimed to have been employed). Harold told F.B.I. agent, Yengst, that he had used the aliases Robert West and Robert Reis; that he had titled the 1950 Oldsmobile in the name of Robert Reis; that he turned the automobile over to Carl who left Florida in it and he had not seen Carl since that time; that he had changed his name and the color of his hair from dark to blond because his wife was trying to get him on a nonsupport charge; that the money he spent in Florida came into his possession through

settlements of two damage suits; that he had purchased a pistol to protect himself against reptiles when he went fishing in the swamps. (The pistol had been found during a search made pursuant to a lawful search warrant in a trunk in Harold's apartment at 1808 Williamson Road, Roanoke. Sometime in September the landlady at that address delivered to Agent Yengst temporary Pennsylvania automobile license tags issued to Close Auto Sales which she had found in Harold's apartment after he had vacated it.) Harold said that Betty was residing in an unknown city in New Jersey.

Harold told Agent Kennedy that the money he had been spending came from his personal bank account in Pittsburgh. This statement was retracted and he then said the money was from insurance settlements. He further stated that he carried as much as $13,000 at one time but he had "blown" all his money, partly in Close Auto Sales and partly by gifts to friends; that he left Florida with a rich married woman from Cleveland whom he declined to identify.

After he was arrested for bank robbery, Harold told the F.B.I. that Mr. Copenhaver was wrong in his recollection that the apartment was rented on Friday, March 8; that the apartment had actually been rented on the evening of March 7 and he had spent all day on Friday, the 8th, cleaning the apartment with his "girl friend." Later Harold said that he and his "girl friend" arrived in Winchester, Virginia, on Tuesday or Wednesday and two or three days later, on March 8, they had rented the apartment. He said that he didn't know why Carl was trying to "frame" him; that he had three reputable witnesses, one a minister, and one a member of the armed forces, who would testify as to his whereabouts at the time of the bank robbery, but he refused to identify them by name or in any other way although requested to do so. (No such persons testified at his trial.)

## CARL

Carl testified at trial that he, Harold, and Betty had driven from Florida in the 1950 Oldsmobile; that they arrived in Winchester on the morning of March 7 and registered at a motel; that on the day of the robbery, March 8, he left Harold and Betty in Winchester, instructing them to try to rent the apartment which had been advertised in a Winchester newspaper which advertisement they had seen on the evening of March 7; that, in Washington, D. C., he met a friend, whom he refused to identify, and that the two of them perpetrated the bank robbery; that upon his return to Winchester on the night of March 8, after the robbery, he first went to the motel but saw no lights and then went to the apartment where he joined Harold and Betty. (Carl must have been surprised and taken aback when the advertisement as quoted in footnote 1 was introduced in rebuttal. The location of the apartment was not given in the advertisement nor was there any reference to a garage apartment or the private entrance on an alleyway. Carl made no attempt to explain. The jury could have reached the conclusion that Carl was lying since he could not have known where to look for the apartment unless he had been there on the night of March 7 or unless he had gained information through some other source which he failed to disclose.)

## BETTY

Betty was a witness at the trial. During the investigation, she had first refused to be interviewed but later consented. Her recollection of the events in Winchester was as follows: She couldn't say when she, Harold, and Carl arrived in Winchester but she remembered Harold registered them at a motel; she couldn't remember how long they were there; Carl bought a newspaper, saw an advertisement concerning an apartment for rent and twice called the given telephone number to inquire about renting the apartment; all three of them went to the address to which they were directed by telephone but Carl waited in

the car while she and Harold rented the apartment and Harold paid the rent; they moved into the apartment that same evening and she thought she remembered Carl and Harold sleeping there that night. The next morning they had breakfast and Harold and Carl left; she spent the remainder of the day cleaning the apartment and, when she retired early in the evening, Carl and Harold had not returned; she remembered distinctly that she had declined the invitation of Mrs. Copenhaver to go shopping the day Harold and Carl were away, stating that she was busy cleaning out cupboards; she did go shopping the next day (Saturday), the same day she and Carl purchased the Olds convertible and took title in her name as "Sandy West." Betty stated twice that she thought they moved into the apartment on a Thursday and she intimated, when testifying, that during an interview with the F.B.I. she had said something about Mr. Copenhaver updating the rent receipt. On cross-examination Betty stated that she had been interviewed three times and that each time she was sick and confused.